PSM HOLDING CORP., a corporation, Plaintiff,

v.

NATIONAL FARM FINANCIAL CORPORATION, a corporation, Business Alliance Insurance Company, a corporation, and Larry P. Chao, an individual, Defendants.

Case No. CV 05–08891 MMM (FMOx).

United States District Court,
C.D. California.

July 26, 2010.

Aluyah Imoisili, Linda Dakin–Grimm, Patricia Quilizapa, Milbank Tweed Hadley and McCloy LLP, Los Angeles, CA, Louis A. Pellegrino, Milbank Tweed Hadley and McCloy, New York, NY, for Plaintiff.

Barbara Harris Chiang, John N. Dahlberg, William F. Murphy, Dillingham and Murphy LLP, San Francisco, CA, Joseph W. Cotchett, Nancy L. Fineman, Niki B. Okcu, Cotchett Pitre & McCarthy, Burlingame, CA, Robert B. Hutchinson, Hutchin-

son & Snider, Beverly Hills, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR RESTITUTION AND ATTORNEYS' FEES

MARGARET M. MORROW, District Judge.

## I. BACKGROUND

Defendant Larry P. Chao and his wife Julie Chao founded Business Alliance Insurance Company ("BAIC") in the 1990s. The Chaos ran BAIC as a family business that provided insurance to small businesses, including small restaurants and grocery stores owned and operated by Asian Americans. BAIC was not profitable for many years after its founding; after the Chaos invested several million dollars and their own labor in the business, however, BAIC became profitable.

In 2005, the Chaos entered into negotiations with PSM Holding Corp. ("PSM") to sell of BAIC to PSM for approximately $21.5 million. The parties anticipated that the proposed stock purchase agreement ("SPA") would be accompanied by a host of ancillary agreements governing future competition, employment, and licensing. Section 14.11 of the SPA stated that the agreement would not become effective until all parties had executed it:

> "This Agreement may be executed in any number of counterparts, each of which shall be an original as against any party whose signature appears thereon and all of which together shall constitute one and the same instrument. This Agreement shall become binding when one or more counterparts, hereof individually or taken together, shall bear the signatures of all the parties reflected hereon as signatories." [1]

Larry Chao signed the proposed SPA in September 2005. Discussions concerning an amended, restated SPA continued, however, until November 2005, when PSM ceased negotiations. In December 2005, PSM filed a lawsuit against BAIC, Larry Chao, and National Farm Financial Corporation ("National Farm"). National Farm was the owner of BAIC when suit was commenced. It, in turn, was owned by a trust created by the Chaos.

PSM's claims ultimately proceeded to trial. At trial, PSM presented expert witnesses who testified to the damages PSM had incurred as a result of its inability to acquire BAIC. PSM's damages experts, Richard Braun and Fred Marziano, performed analyses and provided estimates of PSM's damages. Judge Valerie Fairbank, who tried the case, found that they had employed "acceptable methodologies." Braun and Marziano testified that PSM's total damages were $59.6 million. Braun identified two categories of damages: BAIC's projected earnings as an independent company not owned by PSM and the pre-tax income that would have been generated due to synergy, increased revenues and decreased expenses had BAIC and PSM consolidated their operations. Using Braun's numbers, and taking a "conservative approach," Marziano estimated PSM's lost profits for five years were $59,586,517.00. In its briefs to the Ninth Circuit, PSM argued that the jury relied on this testimony in awarding $40 million against defendants on its breach of contract claim and $3 million on its fraud claim.

Following the verdict, Judge Fairbank denied an ex parte application to stay the judgment pending appeal. As a result, on December 5, 2007, National Farm filed a voluntary bankruptcy petition. On January 7, 2008, Larry Chao declared bankruptcy. Defendants persuasively argue

---

1. Fineman Decl., ¶ 4, Exh. B.

that the bankruptcy filings provided significant benefit to BAIC and, by extension, PSM. They assert that, in the absence of the bankruptcies, the California Department of Insurance ("CDI"), would likely have placed BAIC in conservatorship, an action that might have harmed BAIC's policyholders, employees, and the public, and that BAIC's value would have been lost. PSM participated in the bankruptcy proceedings, joining a successful motion to appoint a Chapter 11 trustee for BAIC and successfully requesting that the trustee replace the Chaos as members of the board of directors. On May 28, 2008, PSM moved for relief from the automatic stay so that it could execute the judgment. The bankruptcy court granted this motion on July 25, 2008, and transferred BAIC's shares to PSM. At that time, BAIC was a successful insurance business with $11 million cash on hand, receivables of more than $2.5 million, and stocks and bonds in excess of $16 million.

During the pendency of the appeal in this case, Larry Chao, Julie Chao, and their son Derrick Chao, continued to work at BAIC. They contend they did so because they were committed to their employees, shareholders, and the public. Despite the negative public perception that the verdict and the bankruptcies could have generated, the company had more than $30 million in assets when it was transferred to PSM on October 1, 2008.

On June 18, 2009, the Ninth Circuit reversed Judge Fairbank's ruling. The court concluded that "the district court [had] erred by allowing the jury to interpret the contract, because the relevant provision was unambiguous and evaluation of extrinsic evidence was unnecessary and inappropriate under California law. The provision at issue required that all parties sign the agreement before it became binding. Several signature lines were left blank. We therefore hold that the parties did not form a valid contract." *PSM Holding Corp. v. National Farm Financial Corp.*, 339 Fed.Appx. 693, 695 (9th Cir.2009) (Unpub. Disp.).

## II. DISCUSSION

### A. Legal Standard Governing Restitution Following Reversal

■ "The right to recover what one has lost by the enforcement by a judgment subsequently reversed is well established. And, while the subject of the controversy and the parties are before the court, it has jurisdiction to enforce restitution and so far as possible to correct what has been wrongfully done." *Baltimore & Ohio Railroad Co. v. United States*, 279 U.S. 781, 786, 49 S.Ct. 492, 73 L.Ed. 954 (1929) (citing *Northwestern Fuel Co. v. Brock*, 139 U.S. 216, 220, 11 S.Ct. 523, 35 L.Ed. 151 (1891) ("We are of opinion that the proceeding to enforce the restitution in the cases mentioned is under the control of the court, and that all needed inquiry can be had to guide its judgment in a summary proceeding, upon motion of the parties")). See also *United States v. Morgan*, 307 U.S. 183, 197, 59 S.Ct. 795, 83 L.Ed. 1211 (1939) ("What has been given or paid under the compulsion of a judgment the court will restore when its judgment has been set aside and justice requires restitution"); *Atlantic Coast Line Railroad Co. v. Florida*, 295 U.S. 301, 309, 55 S.Ct. 713, 79 L.Ed. 1451 (1935) ("[W]hat has been lost to a litigant under compulsion of a judgment shall be restored thereafter, in the event of a reversal by the litigants opposed to him, the beneficiaries of the error"); *Caldwell v. Puget Sound Electrical Apprenticeship and Training Trust*, 824 F.2d 765, 767 (9th Cir.1987) ("Well established principles of restitution permit a court, after being reversed, to order restitution");[2] *Hinchman v. Ripinsky*, 202

---

**2.** In *Caldwell*, the Ninth Circuit reversed a district court's order regarding sexual dis-

F. 625, 627 (9th Cir.1913) ("As it respects the restitution awarded by the District Court, that was a relief very properly granted, under the condition of the record at that time. The decree of the trial court stood reversed and annulled, and the appellant was entitled to have that returned to him which was taken away by an erroneous judgment," citing *Northwestern Fuel*, 139 U.S. at 220, 11 S.Ct. 523).

As defendants correctly note, PSM was not required to execute on the judgment pending appeal and took a risk in doing so. See *Strong v. Laubach*, 443 F.3d 1297, 1300 (10th Cir.2006) ("By executing on their judgment and receiving the [the property] during the pendency of the appeal, the [plaintiff] assumed the risk that [it] might have to repay the money if [defendants] prevailed on appeal").

As the Restatement (First) of Restitution states:

"A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess." RESTATEMENT (FIRST) OF RESTITUTION § 74 (1937).

This rule is consistent with the draft Restatement (Third) of Restitution and Unjust Enrichment:

"A transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution to the extent necessary to avoid unjust enrichment." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 18 (T.D. No. 1, 2001).[3]

In *Stockton Theatres, Inc. v. Palermo*, 121 Cal.App.2d 616, 264 P.2d 74 (1953), a group of Japanese nationals had been leasing and operating a theater in Stockton, California. After the abrogation of a treaty between the United States and Japan, which followed the commencement of the war between the countries, the owner of the theater property sought to invalidate the lease on the ground that the abrogation of the treaty had terminated the lease. The trial court declared the lease void in 1945, finding that it violated California law

crimination in admissions to an apprenticeship program. The district court had entered judgment for the plaintiffs and ordered back pay, attorneys' fees, and front pay, or the difference between plaintiffs' apprentice wages and wages paid to more experienced electricians in light of the seniority lost due to past discrimination. The Ninth Circuit reversed, but its mandate did not authorize or order the refunding of front pay or remand for further proceedings. *Caldwell*, 824 F.2d at 766. Plaintiffs argued that the district court lacked subject matter jurisdiction to hear a motion for restitution. They asserted that because the Title VII claim had been fully resolved by the Ninth Circuit, federal question jurisdiction had terminated, and the parties were not diverse. The Ninth Circuit held that "defendants need not look to Title VII or to diversity principles for jurisdiction in the district court" because federal courts have inher-

ent power to award restitution following reversal of an erroneously entered judgment. *Id.* at 767.

3. The Restatement (First) of Restitution is the current Restatement. See *Broadcom Corp. v. Qualcomm Inc.*, 585 F.Supp.2d 1187, 1190 n. 3 (C.D.Cal.2008). An effort to draft a Second Restatement was initiated but abandoned in the mid–1980s. *In re Norris*, No. 05–43551–7, 2007 WL 2688872, *2 n. 4 (Bankr.D.Kan. Sept. 10, 2007). It does not appear that the draft Second Restatement addressed restitution following reversal of a court judgment. The Third Restatement, although not yet finalized and adopted, represents the most current attempt to address the law of restitution. "Courts routinely cite to draft Restatements as persuasive authority." *Broadcom*, 585 F.Supp.2d at 1191 n. 3 (citing *Starker v. United States*, 602 F.2d 1341, 1344 (9th Cir.1979)).

governing the ownership and leasing of property by aliens ineligible for citizenship. The theater owner then commenced a successful unlawful detainer action. The theater company appealed and obtained a reversal of both judgments. The theater owner turned possession of the property over to the theater company, and returned personal property that had been left there as well. The theater company, however, sued, seeking additional restitution. The theater owner had, while in possession, used both the real and personal property;[4] the theater company argued that he should be required to account for all profit derived therefrom.[5]

A California appellate court found in favor of the theater company. It quoted at length Justice Cardozo's decision in *Golde Clothes Shop v. Loew's Buffalo Theatres*, 236 N.Y. 465, 141 N.E. 917 (1923), which observed: "The defendant knew, when it made the improvements, that its right to the possession was contested by the tenant. It knew that an appeal was

pending. It took the risk, and went ahead." *Id.* at 472, 141 N.E. 917. Employing a similar analysis, the *Stockton* court concluded that although the theater owner

"was guilty of no wrongdoing in seeking to acquire the fruits of the judgments he had obtained, yet he knew those judgments were not final and that the basic one had already been made the subject of an appeal. He knew that if that appeal was unsuccessful it would only be because the uncertain question of whether or not his tenant's lease had been made void by the abrogation of the treaty referred to, should finally be resolved in his favor; and he knew that if the appeal was successful he would be subject to a demand by the theatre company that he account for all that he had received through his enforcement of the questioned judgments. We see nothing unjust in the court's holding him to such an accounting." *Stockton*, 121 Cal. App.2d at 622, 264 P.2d 74.[6]

4. The personal property included the theater seats, projection machines, screens, and other theater paraphernalia.

5. The *Stockton* court also relied on *Ward v. Sherman*, 155 Cal. 287, 100 P. 864 (1909). Under a judgment that was later reversed, the trial court there awarded possession of a cattle ranch, cattle, horses, mules, wagons, harness, farm tools and machinery, to Sherman. Sherman and his grantees remained in possession for approximately four years, at which point the judgment was reversed. The California Supreme Court held that Sherman was required to account for the property received under the judgment, and that if he and his grantees had run the business "in the same manner as an ordinarily prudent man of business would [have] conduct[ed] his own, they [were] not ... chargeable with more than they ha[d] received nor ... responsible for losses that [might have] arise[n], when they ha[d] acted in good faith and with common skill, prudence and diligence." *Id.* at 291, 100 P. 864.

6. The *Stockton* court relied heavily on § 74 of the First Restatement. Although it did not

cite that section, the court appears to have applied the methodology of the following illustration:

"13. A obtains a judgment against B for $3000. Execution is levied upon land of B worth $4000. A is the highest bidder and obtains the property for $3000. The judgment is reversed. B is entitled to specific restitution of the land and the value of its use while in A's possession.
14. A obtains a judgment in ejectment against B and is put in possession of Blackacre. After knowledge that an appeal has been taken, A makes improvements thereon to the amount of $1000, at an expense of $100 repairs a roof which otherwise would have leaked, and pays taxes thereon to the amount of $300. He remains on the land for two years, at the end of which time the judgment is reversed. B is entitled to restitution of the land and to the reasonable rental value of the land during the two years, less the amount expended by A for the necessary repairs and for the payment of taxes; ordinarily [diminishment in] restitution for the value of the improvements

*Stockton* was followed in *Erickson v. Boothe*, 127 Cal.App.2d 644, 274 P.2d 460 (1954). Like *Stockton, Erickson* involved defendants who were dispossessed of real property by the owner following reversal of a judgment. In *Erickson*, the property in question was pasture land. While in her possession, plaintiff kept approximately 200 head of cattle on the land. Defendant testified that he had kept 300 head of cattle. It appears from the decision of the California appellate court that, citing this differential, plaintiff argued that restitution should be something less than defendant's full profit, i.e., that restitution should be discounted because the defendant was able to use the property to greater profit than the plaintiff had been. The court rejected such argument. "Although plaintiff was guilty of no wrongdoing when she retook the property, she knew that judgment was not final; she knew that if the appeal were successful she would be subject to an accounting and full restitution." *Id.* at 649, 274 P.2d 460. The court noted that the "fundamental purpose [of] each enterprise was to realize profit from the use of the property in the particular manner to which it was best adapted. In each instance it was the loss of the business and the business opportunity which plaintiff must restore monetarily to defendant." *Id.* at 649–50, 274 P.2d 460. Stated differently, by virtue of an erroneous judgment, defendant had ceded "his property, his business and his business opportunity" to plaintiff, and was entitled to restitution compensating him for same. *Id.* at 650, 274 P.2d 460. The court concluded that the enhanced profits defendant had been making—profits over and above those plaintiff had been able to make by grazing 200 cattle—were within the scope of defendant's lost business opportunity

and were part of the restitution that had to be paid.

The Delaware Supreme Court considered this issue at length in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060 (Del.1988). Topps had entered into an exclusive licensing agreement with the Major League Baseball Players Association to market the players' names, pictures, and signatures on collectible baseball cards. In 1980, a federal district court in Pennsylvania found in a suit filed by Fleer that the agreement violated certain provisions of the Sherman Antitrust Act. It therefore enjoined Topps from enforcing the exclusive agreement. After the district court and the Third Circuit declined to stay the judgment, Topps and the Players Association complied with the injunction, and Fleer was granted a nonexclusive license to produce baseball cards. In 1981, the Third Circuit reversed. Fleer's nonexclusive license was terminated and Topps regained the exclusive right to produce baseball cards. *Id.* at 1061.

Topps filed an action against Fleer in Delaware Chancery Court, seeking restitution of Fleer's profits during the period the federal court injunction had remained in effect.

On review, the Delaware Supreme Court found for Topps. Defining unjust enrichment as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience," the Court held that Fleer had been unjustly enriched. *Id.* at 1062. It concluded that Fleer was neither a "wrongdoer or misuser," but held that, in the context of restitution following reversal, this fact was irrelevant. *Id.* at 1063.

would not be granted." RESTATEMENT (FIRST) OF RESTITUTION § 74 cmt. f, illus. 13–14. The Restatement specifies that these illustrations apply "although the subject matter is

not land or a unique chattel." *Id.,* § 74, cmt. f.

Rather, it stated, restitution served to "deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses." *Id.* (quoting *Mass Transit Administration v. Granite Construction.*, 57 Md.App. 766, 471 A.2d 1121, 1125 (1984), in turn quoting D. Dobbs, HANDBOOK ON THE LAW OF REMEDIES § 41 (1973)).

Fleer argued that its profits did not flow from its acquisition of Topps' property rights under the exclusive licensing agreement, but from the synergistic effect of its ability to license, its capital investments, its distribution network, and its sales efforts. The Court found this argument "unpersuasive," and held that restitution requires "not only the restoration of the property to its rightful owner but also compensation or reimbursement for the benefits enjoyed by the defendant through the use or possession of plaintiff's property regardless of whether or not the defendant is classified as a wrongdoer." *Id.*[7]

### B. What Measure of Restitution Applies

#### 1. Restitution for Direct Benefits To PSM

The tension regarding the proper measure of restitution in this case is illustrated by two comments in the First Restatement, which the drafters probably intended to be comprehensive, but which do not directly address the issue in this case. Comment d concerns a case in which the party seeking restitution has been forced to pay a money judgment. In such a circumstance, the Restatement notes, "the judgment debtor is entitled to recover the amount thus received by the judgment creditor with interest." RESTATEMENT (FIRST) OF RESTITUTION § 74 cmt. d. This comment is accompanied by two illustrations:

> "11. A obtains a judgment against B. B pays the amount of the judgment to A's agent who absconds therewith. The judgment is reversed. B is entitled to restitution from A.
> 12. A obtains a judgment against B for $3000. Execution is levied on the judgment and B's property, to the value of $4000, is sold. Although the sale is properly conducted, the property brings but $3000 which is paid to A. The judgment is reversed for error of law. B is entitled to restitution from A of only $3000 with interest." *Id.*, § 74 cmt. d, illus. 11–12.

By contrast, where property is obtained either directly as a result of the judgment, through an execution sale, or otherwise, comment e provides that "the judgment debtor is entitled to specific restitution, together with the value of [the property's] use in the meantime, diminished by expenses necessarily incurred in the protection of the property and the payment of taxes and liens, but not including the expense of improvements." *Id.*, § 74 cmt. e. Comment e is accompanied by the following illustration:

> "13. A obtains a judgment against B for $3000. Execution is levied upon land

---

**7.** That *Fleer* is an influential decision in the area of restitution following reversal is evident from the fact that it forms the basis for an illustration in the draft of the Third Restatement. See RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 18 cmt. d illus. 3 ("A sues B, asserting that B's refusal to license A to use certain intellectual property constitutes an illegal restraint of trade. Trial Court gives judgment for A, directing that B grant A a nonexclusive license. A sells goods under the license, in competition with B, during the pendency of the appeal. Appellate Court reverses the judgment. B is entitled to recover the profits made by A under the court-ordered license, to the extent these were made at B's expense," citing *Fleer*, 539 A.2d 1060).

of B worth $4000. A is the highest bidder and obtains the property for $3000. The judgment is reversed. B is entitled to specific restitution of the land and the value of its use while in A's possession." *Id.,* § 74, cmt. e, illus. 13.

Because PSM gained BAIC through the bankruptcy proceedings, it appears that illustration 13 applies.[8] Defendants argue, however, that since acquiring BAIC on October 21, 2008, PSM has altered the essential nature of the company, integrating it into PSM. They contend that PSM has altered BAIC's operating systems, changed the company culture, computerized processes and eliminated broker-client contact, modified the reinsurance arrangements negotiated by the Chaos, and changed the make-up of the company's core customers.[9] Defendants cite the fact that PSM caused BAIC to enter into a 90% quota share treaty pursuant to which PSM became the 90% reinsurer for all BAIC clams.[10] PSM counters that this "contract can be rescinded, so that Defendants can once again arrange their own reinsurance if they like."

**8.** It is irrelevant that BAIC was awarded in a parallel proceeding or that Chao's and National Farm's declarations of bankruptcy can be characterized as voluntary rather than compelled by court order. Judge James Selna recently considered this issue at length. In *Broadcom,* a jury found that Qualcomm directly infringed and induced infringement of a patent relating to cell phone technology. Judge Selna entered a permanent injunction against Qualcomm, although the injunction permitted Qualcomm to phase its technology out over a period of an approximately two years so long as it paid mandatory royalties to Broadcom. The Federal Circuit reversed the judgment, concluding that Broadcom's patent was invalid. *Broadcom,* 585 F.Supp.2d at 1188–89.

Broadcom contended that it should not be required to repay the royalties it had received, because Qualcomm was under no obligation to pay the royalties. It asserted that following entry of the injunction, Qualcomm "faced a choice: either immediately cease to infringe the then-valid patent '686, or purchase a stay of that injunction." *Id.* at 1189. It argued that restitution is mandated only in situations involving "compulsion" by the court entering an erroneous judgment. *Id.* at 1190 & n. 1 (quoting *Morgan,* 307 U.S. at 197, 59 S.Ct. 795) ("What has been given or paid under the *compulsion* of a judgment the court will restore when its judgment has been set aside and justice requires restitution" (emphasis in *Broadcom* )). Judge Selna disagreed. He noted that "courts have frequently held that, when a benefit has been conferred in *compliance* with a judgment subsequently reversed, restitution may be required." *Id.* (quoting *Iowa Electric Light and Power Co. v.*

*Atlas Corp.,* 654 F.2d 704, 706 (8th Cir.1981) (emphasis in *Broadcom* )). He also noted that the draft Third Restatement applied to transfers of property occurring "in compliance with *or otherwise in consequence of* a judgment that is subsequently reversed or avoided." *Id.* (quoting RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 18 (emphasis in *Broadcom* )). See also *id.* ("Third, the draft Restatement specifically anticipates and addresses Broadcom's contention on this issue: '[p]arties resisting restitution sometimes assert that the judgment debtor has made a "voluntary payment" (for instance, in electing to pay a judgment rather than post a bond), but the contention is uniformly rejected,' " quoting RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 18 cmt. c). Judge Selna concluded that "[t]he essential factor appears to be that the transfer occurred as a consequence of the court order." PSM does not dispute this rule or the fact that the transfer of BAIC to it occurred as a consequence of a court order that was subsequently reversed. PSM's argument concerns the *measure* of restitution, not defendants' entitlement to it.

**9.** Larry Chao Decl., ¶ 14.

**10.** See *Michigan Mutual Insurance Co. v. Unigard Securities Insurance Co.,* 44 F.3d 826, 827 (9th Cir.1995) (a quota share treaty is an agreement under which "one insurer (the 'ceding insurer' or 'reinsured') 'cedes' all or part of the risk it underwrites, pursuant to a policy or group of policies, to another insurer. The reinsurer indemnifies the ceding insurer on the risk transferred, thereby diversifying the risk of loss").

Defendants do not persuasively demonstrate that restitution cannot be achieved by directing PSM to return BAIC's shares.[11] The Restatement addresses the situation in which property that changed hands due to an erroneous judgment has lost value. It states that "[t]he judgment creditor is not liable for losses not caused by his mismanagement of the property . . ., except where the action was brought in bad faith or where there was a sale on execution and the sale was improperly conducted," RESTATEMENT (FIRST) OF RESTITUTION § 10 cmt. f, and provides the following illustrations:

> "15. In an action of ejectment brought by A against B, A obtains possession of Blackacre which he occupies for two years, until the judgment is reversed. During that period fires for which A was not at fault destroy valuable timber upon Blackacre. B is entitled to restitution of Blackacre but not to compensation for the loss.
>
> * * *
>
> 17. A obtains a judgment against B for $3000. B's property, worth $4000, is sold on execution sale to a stranger and, because of improper conduct by A which discourages bidding, the property brings only $3000. The judgment is reversed. B is entitled to restitution from A of $4000." *Id.,* § 74 cmt. f, illus. 15, 17.

Defendants do not assert that BAIC has declined in value due to mismanagement. Indeed, they emphasize that BAIC has continued to generate profits "even in this economy," and that its surplus has increased. Defendants cite financial news articles that favorably describe BAIC's profit outlook. The court does not construe defendants' argument, therefore, to be that the property has lost value, but only that its nature has changed so significantly that specific restitution is illogical. In simple terms, they appear to contend that they were forced to give up an apple and would now receive an orange.

Neither the First Restatement nor the draft Third Restatement address restitution where specific restitution would be appropriate but is impossible. There is some limited case law on the subject, however. In *Asato v. Emirzian,* 177 Cal. 493, 171 P. 90 (1918), Asato entered into a contract to grow and deliver 4,000 orange trees. The trees were not delivered and Emirzian sued for specific performance. A court-appointed receiver took possession of the trees from Asato, and the trees were planted on Emirzian's land. The decision was reversed on appeal. The California Supreme Court noted the general rule that "where a plaintiff by virtue of a judgment rendered in an action obtains possession of money or specific property of the defendant therein, the latter upon a reversal of the judgment on appeal therefrom is entitled to restitution of the property or proceeds of the sale thereof under execution." *Id.* at 495–96, 171 P. 90. Because the trees had been planted on Emirzian's land, however, the Court concluded that they had "chang[ed] their character from nursery stock, which constituted personal property, to a part of his real property, thereby placing it beyond his power to make restitution." *Id.* at 496, 171 P. 90.[12] It held that by the act of planting, defendant had converted the as fully "as though

---

11. Indeed, they appear to assume that they have the option of declining to accept return of BAIC's shares and offer their contentions concerning the fundamental changes in BAIC's operations only in two brief footnotes.

12. Although the trees had died after being planted on defendant's land, the Court held this was "immaterial unless such loss could be attributed to some cause for which defendant was not responsible existing prior to the conversion." *Id.* at 497, 171 P. 90. Rather, the Court focused on defendant's decision to change the character of the trees to by planting them. *Id.*

the subject of controversy had been a lot of hay, upon the taking of which, defendant had thereupon fed it to his cattle." *Id.* at 497, 171 P. 90.[13] The Court therefore concluded that defendant's liability for restitution "should be measured by the value of the trees at the time of the conversion," i.e., at the moment of planting. *Id.* See also *Ashton v. Heydenfeldt,* 124 Cal. 14, 18, 56 P. 624 (1899) ("In such case the plaintiff is entitled to a restitution of everything still in the possession of the defendants, in specie. The suit being in equity the court has power to compel the delivery of the property received by the defendant, even though it be of a character such as to make its seizure under a writ of replevin impossible; or if it is no longer in the possession or control of the defendants the court may compel compensation in money" (citation omitted)).

While *Asato* is almost a century old, it appears highly relevant to this case given that neither the First Restatement, draft Third Restatement, nor other cases address the consequences of a change in the character of property that has been transferred due to an erroneous judgment. In

*Asato,* specific restitution was unavailable and the court was forced to fashion a different remedy given the legal impossibility of ordering the property's return. See also *Penhallow v. Doane's Administrators,* 3 U.S. 54, 3 Dall. 54, 1 L.Ed. 507 (1795) (holding that where a vessel that was the subject of restitution had already been sold and removed from the venue, specific restitution was "impracticable");[14] *American General Insurance Co. v. Equitable General Corp.,* 493 F.Supp. 721, 759 n. 68 (E.D.Va.1980) (finding that specific restitution was not possible because the shares of stock at issue had ceased to exist); *Todd v. Bettingen,* 109 Minn. 493, 501, 124 N.W. 443 (1910) (noting that specific restitution was not appropriate because it had "become justly impossible or impracticable for plaintiff to return in specie"). The dearth of authority addressing this question may reflect the infrequency with which the issue arises and the limited circumstances in which a party entitled to specific restitution by law may receive monetary compensation, i.e., only where specific restitution is impossible or impracticable.[15]

13. The Court emphasized that had Emirzian not planted the trees, and instead retained them as personal property, "in which character they were received by him, he could at any time thereafter have made restitution to Asato." *Id.* at 497, 171 P. 90. It did not explain how the trees might have survived without being planted. The Court also noted that had the trees been sold, "the proceeds thereof coming into the hands of Emirzian would, in the absence of fraud, have fixed the amount of his liability." *Id.*

14. In *Penhallow,* the judgment was a decree ordering that the shipowner's vessel be returned by parties who had claimed it as prize during the American Revolution pursuant to an Act of the Continental Congress. Because the ship had already been sold, the enforcing court converted the judgment to its monetary value and awarded a specific sum to the shipowner's administrator.

15. The First Restatement addresses an analogous scenario. Section 170, which applies where a person is induced by fraud, duress, undue influence, or mistake to improve real property and increases its value, states: "If in such a case the improvement cannot be severed from the land or chattels upon which the improvement has been made, and specific restitution is therefore impossible, the owner of the land or chattels cannot be compelled to surrender them.... The person making the improvements, however, may be entitled to restitution of the value of the benefit conferred or the value of what he has expended." RESTATEMENT (FIRST) OF RESTITUTION § 170 cmt. a.

The draft Third Restatement provides an example of a situation in which rescission of a property transfer has been rendered impossible by subsequent transactions. It notes that in such a circumstance, a court may order restitution of the property's "traceable product":

There is no factual or legal basis for defendants' conclusion that it would be impossible or impracticable for PSM to return BAIC to them. They offer the following analogy: "This would be like trying to return a small, family run store catering to a local, minority community that was acquired and run by Wal–Mart for a year after Wal–Mart replaced the family who first opened the store." [16] This argument suggests that defendants believe specific restitution would not be ideal; it does not demonstrate that specific restitution is impossible or impracticable. There is no legal basis for concluding that specific restitution cannot be ordered because property cannot be returned in the same condition it was in when it was tendered.[17]

---

"Black agrees to convey Blackacre to White in exchange for Whiteacre plus $75,000. White delivers a deed to Whiteacre and places in escrow a promissory note for $75,000, secured by a mortgage on Blackacre, to be delivered to Black upon Black's delivery of a deed to Blackacre. Title to Blackacre is disputed, and it is eventually discovered that Black has no title to convey. Breach of this character entitles White to rescind the contract with Black ... if the court can decree an adequate restoration of performance on both sides[]. White cannot obtain specific restitution of Whiteacre, because when the facts come to light, Black has already sold Whiteacre to Green, a bona fide purchaser, in exchange for a note for $300,000 secured by a mortgage on Whiteacre. On the other hand, White can follow the property to which she is entitled on rescission (Whiteacre) into Green's note and mortgage as its traceable product. Rescission and restitution may be accomplished, in the discretion of the court, by (i) cancellation of White's [$75,000] promissory note and (ii) subrogation of White to the Green note and mortgage." RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58 (Tent. Draft No. 6) cmt. a, illus. 4. Both section 170 and the example in the draft Third Restatement address situations in which specific restitution is a factual or legal impossibility. Section 170 is an example of factual impossibility because the improvements cannot be severed from the land and restored to the party making them. The example in the draft Third Restatement addresses legal impossibility, as a court has no legal authority to order a third-party bona fide purchaser to return property to its original owner.

16. Reply at 15. In their reply, defendants do not reiterate their earlier contention that the quota share treaty makes it impossible to return BAIC to them. Implicitly conceding PSM's point that the agreement could be rescinded, defendants rely instead on an argument that the culture at BAIC has changed.

17. Indeed, defendants identify no standard by which the court could determine what quantity or quality of change warrants dispensing with specific restitution as the appropriate remedy. Consider a situation in which A tenders Whiteacre to B as the result of a judgment that is overturned on appeal. By the time the judgment is reversed, B has painted the primary building erected on Whiteacre, changing its color from white to black. Painting the property has not diminished the market value of Whiteacre, although it has diminished A's subjective desire to own the property, since A prefers white houses, and it would be a significant burden to repaint the now-black building white. Requiring B to pay monetary damages where specific restitution could be made would be inappropriate and, more importantly, would do nothing to advance the policy purpose of restitution, which is to prevent unjust enrichment. See RESTATEMENT (FIRST) OF RESTITUTION § 1 ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other"). "A person is enriched if he has received a benefit." Id., § 1 cmt. a. Once Whiteacre is returned to A, B retains no benefit at all, much less a greater benefit because he painted Whiteacre a different color. Defendants' argument that BAIC's corporate culture has changed appears to be no different than painting Whiteacre a new color and provides no legal basis for departing from the rule that specific restitution is mandated.

This hypothetical is a *reductio ad absurdum* example that is not intended to mirror defendants' situation precisely. Returning a company that has been fundamentally altered could pose significant challenges. The hypothetical, however, reflects the fact that the standard defendants propose is inherently subjective in two respects. The first subjective

See *South Fork Canal Co. v. Gordon*, 2

element is *when* it would be appropriate to apply such a rule. The value of corporate culture is no more measurable than the value of the color of a building. In the hypothetical, A attaches significant subjective value to the color of his house. Given the difficulty of painting a black house white without the black underneath bleeding through, it may be impossible ever to return the house completely to its original color. A rule that rests solely on the extent to which the party seeking restitution subjectively values the color of a building or the corporate culture of a company, however, is essentially a grant to that party of an option to choose the remedy it prefers. Whenever there is a change in leadership at a company, no matter how big or small, there will be a change in culture that may diminish the value of the company to its prior owner. Defendants assert that changes in "operating systems," the introduction of computers, and unspecified alterations in the "make-up of core customers," have diminished the subjective value of the company to Larry Chao. (Notably, there is no evidence of the subjective value of BAIC to National Farm, which is a co-movant.) The type of purely subjective standard defendants advocate is unworkable, and is unrelated to the purpose of restitution, which is to consider to what extent the opposing party has been unjustly enriched.

The second subjective element of defendants' proposed rule is the *amount* of compensation to be paid for the lost subjective value. Defendants Farm make no attempt to monetize BAIC's lost subjective value; rather, they seek to recover $59.6 million, which purportedly is the current economic value of the company. The following illustration from the First Restatement is instructive:

"In an action of ejectment brought by A against B, A obtains possession of Blackacre which he occupies for two years, until the judgment is reversed. During that period fires for which A was not at fault destroy valuable timber upon Blackacre. B is entitled to restitution of Blackacre but not to compensation for the loss." RESTATEMENT (FIRST) OF RESTITUTION § 74 cmt. f, illus. 15. This example is intended to illustrate the rule that the "judgment creditor is not liable for losses not caused by his mismanagement of the property." *Id.*, § 74 cmt. f. Even assuming illustration 15 applies to a reduction in subjective value to the same extent it applies to a reduction in monetary value—an assumption the court finds untenable for reasons

described earlier in this footnote—the court would have to conclude that PSM was at "fault" for making changes in BAIC's business model that increased its monetary value before it could award monetary compensation for the changes. Such a finding would not be possible. Consider an additional illustration from the First Restatement:

"A obtains a judgment in ejectment against B and is put in possession of Blackacre. After knowledge that an appeal has been taken, A makes improvements thereon to the amount of $1000, at an expense of $100 repairs a roof which otherwise would have leaked, and pays taxes thereon to the amount of $300. He remains on the land for two years, at the end of which time the judgment is reversed. B is entitled to restitution of the land and to the reasonable rental value of the land during the two years, less the amount expended by A for the necessary repairs and for the payment of taxes; ordinarily restitution for the value of the improvements would not be granted." *Id.*, § 74 cmt. e, illus. 14.

Under the rule advocated by defendants, if the $1000 in improvements reduced the subjective value of Blackacre to B, B would be entitled to reject specific restitution and demand monetary compensation for the value of the property. If one assumes that the $1000 in improvements were necessary to prevent waste or other reduction in the value of the property, A might incur liability if it made the improvement because this diminished the subjective value of the property to B, and might also incur liability if it did not make the improvement because it was at fault in not preventing waste. Thus, if the alterations PSM made to BAIC, including improved operating systems and computerization, were required because in a technological age, customers expect to be able to do business online and because a reduction in operating expenses was necessary to retain customers in a poor economy, PSM would incur monetary liability for making the improvements because they reduced the subjective value of BAIC to defendants, but might also incur monetary liability for failing to make the improvements if the failure constituted "fault" in the form of careless or negligent mismanagement. See *Ward*, 155 Cal. at 290, 100 P. 864 (noting that a judgment creditor was not required to compensate for losses because he was "not guilty of carelessness, negligence, or mismanage-

Abb. (U.S.) 479, 22 F.Cas. 826, 829 (Field, Circuit Justice, C.C.D. Cal. 1868) (No. 13,-189) ("The restoration in specie in such cases being impossible . . . , it follows that the right which the reversal gives must be that of action to recover an equivalent for the lost thing. And perhaps the rule may be stated thus: That the defendant or unsuccessful party in the court below is to be restored, by reversal, to all things which he lost by the erroneous judgment or decree, if the title to them has not passed [to a third party; if] the previous enforcement [of] the judgment or decree direct[ed] a sale of property [to a third party] he is to have a right of action for a money equivalent"); *Reynolds v. Hosmer,* 45 Cal. 616, 626–28 (1873) (although an action sought damages following reversal of a judgment that had transferred ownership of a canal and flume, the court converted the action to one for recovery of the property because "their remedy was to recover back the property, and not damages"); *Cowdery v. London & San Francisco Bank,* 139 Cal. 298, 306, 73 P. 196 (1903) ("I[t] follows from these authorities that the plaintiff in this action is entitled to judgment setting aside the sale and for the recovery of the possession of the property"); *McCracken v. Paul,* 65 Ark. 553, 47 S.W. 854, 854 (1898) (holding that plaintiff was entitled to an order of restitution, and that defendant could be held liable for plaintiff's loss of the property only if he could not restore it in specie); *Fort Madison Lumber Co. v. Batavian Bank,* 77 Iowa 393, 42 N.W. 331, 332 (1889) (where plaintiff lumber company gave up some quantity of its stock certificates to a bank pursuant to a judgment that was subsequently reversed, and where the bank then refused to loan money to the lumber company resulting in the company's failure and insolvency, the lumber company was entitled only to specific restitution of the stock certificates because the decision not to loan money was a business decision of the bank and did not constitute fault requiring that the bank compensate the lumber company monetarily); *Graham v. Eagan,* 15 La.Ann. 97, 1860 WL 5513, *1 (La.1860) (reviewing at length the history of restitution under Roman Law and holding that under the principle of *restitutio in integrum,* where property has not passed to a third party, the judgment creditor must "restore the *property* itself, and place the appellant in the same condition he would have occupied if he had not been harassed with an unfounded demand" (emphasis original)).

■ The court therefore concludes that this case is controlled by *Stockton* and *Erickson,* as well as by § 74, comment e of the First Restatement governing specific restitution. Defendants are entitled to specific restitution of the BAIC shares. Moreover, they are entitled to an accounting of the profits earned while PSM held BAIC, "diminished by expenses necessarily incurred in the protection of the property and the payment of taxes and liens." RESTATEMENT (FIRST) OF RESTITUTION § 74 cmt. e. PSM is not, however, entitled to reduce the amount of restitution by subtracting the "expense of [any] improvements" it made. *Id.*[18]

### 2. Restitution for Consequential Damages

■ Defendants also seek restitution of the costs they incurred in connection with the bankruptcy proceedings as well as

---

ment, but acted with reasonable care, judgment, and discretion").

**18.** As noted in *Stockton,* "[t]he defendant knew, when it made the improvements, that its right to the possession was contested by the tenant. It knew that an appeal was pending. It took the risk, and went ahead." *Stockton,* 121 Cal.App.2d at 622, 264 P.2d 74 (quoting *Golde Clothes,* 236 N.Y. at 472, 141 N.E. 917).

wages for Larry, Julie, and Derrick Chao, who for a time worked at BAIC during the pendency of appeal. Defendants maintain that the bankruptcy benefitted PSM because, had the Chaos and National Farm not sought bankruptcy protection, the California Department of Insurance would have placed BAIC in conservatorship.[19] They also contend that the bankruptcy proceedings protected BAIC's assets and provided an orderly way to transfer the company to PSM.

Defendants' argument relies on a misconstruction of Judge Selna's opinion in *Broadcom*. Defendants assert *Broadcom* held that a party seeking restitution can recover all sums lost "as a consequence of the court order."[20] In fact, Judge Selna held that "[t]he essential factor [in determining whether it is appropriate to order restitution] appears to be that the *transfer* [of property] occurred as a consequence of the court order." *Broadcom*, 585 F.Supp.2d at 1190–91 (emphasis supplied).

Here, the judgment may have been a but-for cause of defendants' initiation of bankruptcy proceedings. PSM disputes, however, that those proceedings were of

benefit to it such that defendants are entitled to restitution of costs incurred prosecuting the bankruptcies. "[C]ourts have universally held that where a judgment is reversed, appellants are entitled to restitution of the benefits received by the other party (plus costs and interest), but to no more." *In re Popkin & Stern*, 263 B.R. 885, 890 (8th Cir. BAP 2001) (citing *Kansas City Southern Ry. Co. v. Southern Trust Co.*, 279 F. 801 (8th Cir.1922)) (holding that where restitution in specie was not possible, the party seeking restitution is entitled to the value of the property but no more); *U.S. Industries, Inc. v. Gregg*, 457 F.Supp. 1293, 1298 (D.Del.1978) (finding that a party seeking restitution was entitled to the benefits conferred on the opposing party, but that he was not entitled to attorneys' fees and costs incurred in having a sequestration order vacated), aff'd, 605 F.2d 1199 (3d Cir.1979), cert. denied, 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980).[21]

■ Defendants cite no case in which a court has ordered restitution in the form of attorneys' fees or costs incurred in the same or a parallel proceeding.[22] More-

---

**19.** The only evidence of this is Larry Chao's declaration, in which he states that "the Department of Insurance told [him] that it probably would have placed BAIC into conservatorship." (Larry Chao Decl., ¶ 2.) In addition to lacking specificity, the statement is hearsay because it is an out-of-court "statement ... offered ... to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Hearsay of this nature generally "is not admissible." Fed.R.Evid. 802. Nonetheless, "trial courts do not render *sua sponte* decisions on the admissibility of hearsay evidence; that is for the parties to raise and argue, which was never done in this case." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 563 (6th Cir.2008). Although the court cannot strike Chao's statement regarding the possibility of a conservatorship, it does consider the hearsay nature of the statement, its lack of specificity, and the fact that it is not attributed to any specific individual in the Department of

Insurance in assessing its credibility and reliability.

**20.** Reply at 11 (quoting *Broadcom*, 585 F.Supp.2d at 1190–91).

**21.** The *Gregg* court emphasized that it had "found no case in which a plaintiff, following reversal of an erroneous injunction, judgment, attachment, or other decree has received in restitution an amount greater than the value of the benefit which had been conferred upon his opponent as a result of the erroneous order." *Gregg*, 457 F.Supp. at 1298–99.

**22.** The limited citations provided by defendants are distinguishable. In *Pay Less Drug Stores v. Bechdolt*, 92 Cal.App.3d 496, 155 Cal.Rptr. 58 (1979), plaintiff sought rescission of a contract and restitution of the $410,000 purchase price that had been paid. The court stated broadly that " '[i]n granting restitution

as a remedy for breach ... the purpose to be attained is the restoration of the injured party to as good a position as that occupied by him before the contract was made.'" *Id.* at 501, 155 Cal.Rptr. 58 (quoting RESTATEMENT (FIRST) OF CONTRACTS § 347 cmt. b (1932) (articulating the standard governing restitution when one party has performed a contract while the other party has totally breached)). The relief it ordered, however, was simply return of the $410,000; it did not award consequential damages.

Defendants also cite *People v. Millard,* 175 Cal.App.4th 7, 95 Cal.Rptr.3d 751 (2009), arguing that it is a case in which the court awarded economic losses, including medical expenses and attorneys' fees as well as restitution. *Millard,* however, was a criminal case that addressed statutorily enumerated forms of restitution that a convicted criminal must pay his victims. It has no application in this common law civil action.

*Walnut Creek Manor v. Fair Employment & Housing Commission,* 54 Cal.3d 245, 284 Cal. Rptr. 718, 814 P.2d 704 (1991), considered the constitutionality of California Government Code § 12987, which permits California's Fair Employment and Housing Commission to order certain forms of relief if it finds that a respondent has engaged in an unlawful and discriminatory practice. These include an order directing the sale or rental of a housing accommodation to the victim; injunctive or other equitable relief; civil penalties; and actual damages. The statute was challenged on the ground that it constituted the exercise of judicial power by a nonjudicial body in violation of the judicial powers clause of the California Constitution, CAL. CONST. art. VI, § 1. The California Supreme Court upheld the statute insofar as it permitted the Commission to award "restitutive damages" as opposed to "unlimited, nonquantifiable compensatory damages." *Id.* at 262, 284 Cal.Rptr. 718, 814 P.2d 704. It described "restitutive damages" as "akin to special damages, i.e., they are quantifiable amounts of money due an injured private party from another party to compensate for the pecuniary loss directly resulting from the second party's violation of law." *Id.* at 263, 284 Cal.Rptr. 718, 814 P.2d 704. The decision in *Walnut Creek* focuses solely on the scope of permissible delegation of powers to an administrative body under California constitutional and administrative law, and has no bearing on the scope of restitution properly awarded under the common law when a judgment is subsequently reversed.

In *Gardiner Solder Co. v. Supalloy Corp., Inc.,* 232 Cal.App.3d 1537, 284 Cal.Rptr. 206 (1991), the court considered whether California Revenue and Taxation § 23304 prohibited a restitution award. The party seeking restitution had delivered $50,000 worth of solder under a contract later determined to be void because it was not qualified to do business in California. Because it had already delivered the solder, the party sought restitution. The trial court concluded that because the Revenue and Taxation Code provided a remedy that did not include restitution, restitution was prohibited. The California appellate court disagreed. Because the solder had already been sold to a third party, specific restitution was unavailable. The appellate court expressed no opinion regarding the measure of restitution that the trial court should employ, remanding for that determination, but noted that a party "should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made." *Id.* at 1542, 284 Cal.Rptr. 206. As a consequence, *Gardiner* does not support an award of consequential damages unrelated to the benefit obtained.

Finally, *Dinosaur Development, Inc. v. White,* 216 Cal.App.3d 1310, 265 Cal.Rptr. 525 (1989), if anything, undercuts defendants' position. Plaintiff Dinosaur Development and defendants Elma and Lewis White owned undeveloped parcels of land. Dinosaur submitted a plan to construct three single-family residence on its property and construct a road onto its property ending in a cul-de-sac. The Whites demanded that the government agency reviewing the plan require that Dinosaur ensure access to the road for their property as a condition of approval; the government did so. *Id.* at 1313–14, 265 Cal.Rptr. 525. Dinosaur brought an action for restitution, arguing that compliance with the condition would require expenditure of a substantial sum of money and would provide an exclusive benefit to the Whites' property at its expense. It sought recovery of the increased value of the Whites' property and the cost of construction. *Id.* at 1314, 265 Cal.Rptr. 525. The California appellate court concluded that no restitution was warranted. Citing the First Restatement, the court concluded that "the mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." *Id.* at 1315, 265 Cal.Rptr. 525 (quoting RESTATEMENT (FIRST) OF RESTITUTION § 1 cmt. c ("Thus, one who improves his own land ordinarily benefits his neighbors to some

over, defendants' argument rests on a logical fallacy in that they assert, on the one hand, that PSM should pay restitution for all costs they incurred in connection with the bankruptcy proceedings, but repeatedly argue that the measure of restitution is the *"benefits* **[PSM] derived from** ..." the proceedings.[23] There is no factual basis for believing that every dollar spent in the bankruptcy proceedings—some $1,513,762.32—benefited PSM. Indeed, defendants' central argument is that PSM received a benefit, if at all,[24] because the bankruptcy proceedings protected the value of BAIC. To the extent that argument can be credited, defendants will now have that benefit returned to them in the form of the BAIC shares. For this reason, awarding costs incurred in connection with the bankruptcy as well on the ground that the expenditures increased the value of BAIC would essentially constitute double restitution.

As respects the wages that Larry, Julie, and Derrick Chao would otherwise have earned during the approximately one-year period from the time the judgment was entered to the date it was enforced, Larry Chao states that he consistently worked 11.5 hour days and on Saturdays as President of BAIC to ensure the company's viability.[25] Julie Chao worked 10–12 hour days as the company's chief financial officer, five days a week, without pay. She asserts that she worked harder after the judgment than she did before to ensure the continued viability of the company.[26] Derrick Chao, BAIC's vice president of finance, oversaw daily operations and the investment portfolio. He gave up his year-end bonus to minimize expenses.[27]

Defendants' motion for restitution seeks wages "calculated at the annual rate at the time of their departure from BAIC." [28] The court cannot discern whether this request seeks to have wages for work prior to the enforcement of the judgment calculated at the rate of pay defendants were receiving when they left the company, or whether defendants contend they are entitled to

---

extent, and one who makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution")) See also RESTATEMENT (FIRST) OF RESTITUTION § 106 ("A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution"); *Dinosaur*, 216 Cal.App.3d at 1319, 265 Cal.Rptr. 525 ("[W]ithin the limits of the police power some uncompensated hardships must be borne by individuals as the price of living in a modern enlightened and progressive community"). *Dinosaur*, therefore, stands for the proposition that there are many expenses that must be incurred that are not compensable through restitution even if they benefit another.

23. Motion for Restitution at 16 (emphasis original). For instance, in valuing BAIC, defendants repeatedly argue that PSM should return its monetary value—$59.6 million—because that constitutes the benefit to PSM rather than the loss to defendants.

24. PSM vigorously disputes that it benefited from the bankruptcy. Rather, PSM argues that the bankruptcy proceedings, and the automatic stay, impeded its ability to enforce the judgment and obtain control of BAIC. Indeed, PSM was prevented from enforcing its judgment for more than a year as a result of the automatic stay—from Judge Fairbank's entry of judgment on October 3, 2007 until October 21, 2008, when the bankruptcy court awarded it the BAIC shares. PSM asserts that it delayed seeking enforcement of the judgment and engaged in mediation for a period of time at the request of the bankruptcy court and the bankruptcy trustee. Thus, it file a motion to enforce the judgment in bankruptcy court until May 28, 2008.

25. Larry Chao Decl., ¶¶ 6–12.

26. Julie Chao Decl., ¶ 3.

27. Derrick Chao Decl., ¶¶ 2–4.

28. Motion for Restitution at 20.

wages for the period following their departure from the company. In an abundance of caution, therefore, the court addresses two forms of damages below: restitution for the benefit of the Chaos' continued labor during the pendency of appeal, inasmuch as it improved the value of the company and thus benefitted PSM, and lost wages following their termination from the company.

As a threshold matter, Derrick and Julie Chao are not parties to this action and did not file the motion for restitution that is presently before the court. PSM asserts there is no basis for Larry Chao and National Farm to seek funds on behalf of either Julie or Derrick, and neither defendant has identified a basis on which such relief could be granted. Defendants, in fact, do not respond to PSM's argument in their reply, and the court concurs with PSM that the only claims properly considered are claims for funds to which National Farm and Larry Chao are entitled.[29]

It appears that during the period prior to the date the bankruptcy court ordered transfer of BAIC's shares, Larry received a salary of $180,000 annually. The Chaos continued to work at BAIC "during the pendency of the appeal to maintain BAIC's success." Although they were devastated by the jury verdict, they continued to go into work each day at BAIC because they believed in the appellate process.[30] It appears, therefore, that Larry Chao worked

for BAIC, and received a salary, because he wanted to protect the value of his company, which he expected to have returned to him following appeal. Given that the proper measure of restitution will return BAIC to National Farm and Larry Chao, defendants identify no benefit received by PSM as a result of Larry Chao's continued work that must now be returned. As for Chao's lost wages following transfer of the company to PSM, like the bankruptcy costs defendants seek, there is no legal basis for awarding consequential damages of this nature and defendants cite none. Such wages can be recovered, if at all, in an action for wrongful termination. A court hearing such an action would have before it evidence of Chao's efforts to mitigate damages—evidence which is absent in this record.

In sum, for all of the reasons stated, the court concludes that the categories of consequential damages defendants seek are not restitution that is properly awarded following reversal of the judgment in this case.

### 3. Interest on PSM's Profits

Defendants next seek interest on the monetary portion of the restitution.[31] An award of interest on monetary restitution is equitable in nature and subject to the court's discretion. See *Textron Financial Corp. v. National Union Fire Ins. Co. of Pittsburgh*, 118 Cal.App.4th 1061, 1085, 13

---

29. Among the fees National Farm and Larry Chao seek to recover are fees charged by an attorney that Julie Chao retained to sue Larry Chao for breach of fiduciary duty in his role as her husband and co-trustee and beneficiary of the Chao Family Trust. Although none of the parties' filings address this expense in any detail, the fact that Julie and Larry Chao were adverse parties in litigation underscores the impropriety of allowing National Farm and Larry Chao to seek the recovery of funds to which Julie Chao is allegedly entitled.

30. Motion at 10.

31. In their motion, defendants argued that the company had changed so substantially that return of the BAIC shares would be inappropriate. They therefore sought monetary restitution only, and requested that PSM be ordered to pay interest on the entire amount of the judgment. Because the court has concluded that it is appropriate to return the business to defendants, it considers only whether defendants are entitled to interest on the monetary portion of the restitution award (i.e., the profits PSM made from the business while in its control).

Cal.Rptr.3d 586 (2004) (noting that the appellate court's power to award interest on restitution "is discretionary and may be denied if to do so would be inequitable under the circumstances"). See also *Caldwell,* 824 F.2d at 767 (reviewing for abuse of discretion and affirming the district court's order refunding pay without interest).

In general, however, the vast majority of cases have awarded interest. See, e.g., *Baltimore & Ohio Railroad,* 279 U.S. at 786, 49 S.Ct. 492 (refunding the amount paid "together with interest thereon"); *Broadcom,* 585 F.Supp.2d at 1191 (awarding royalty payments plus interest). The Restatement mandates an award of interest where a monetary payment had been made on the original judgment, but is silent on the issue when the restitution ordered comprises profits generated by property that was transferred. RESTATEMENT (FIRST) OF RESTITUTION § 74 cmts. d ("If payment has been made to the judgment creditor or to his agent, or to an officer who has paid the judgment creditor, upon reversal of the judgment the payor is entitled to receive from the creditor the amount thus paid with interest"), e ("If the property of the judgment debtor was awarded to the judgment creditor, or if the judgment creditor purchased it upon execution sale, the judgment debtor is entitled to specific restitution, together with the value of its use in the meantime").

■ *Textron* holds that interest "may be denied if to do so would be inequitable under the circumstances." *Textron,* 118 Cal.App.4th at 1085, 13 Cal.Rptr.3d 586. The court interprets *Textron,* therefore, as standing for the proposition that interest should be awarded unless so doing would be inequitable. PSM has for several years held BAIC as well as the profits it has earned from operating that business. The court finds nothing inequitable about awarding defendants not only the profits

that have been earned during this period, but interest on those profits as well. Consequently, the court will award interest on the profits once an accounting has been made.

### 4. Conclusion Regarding Restitution

The court finds that defendants are entitled to the return of BAIC's shares. Because it appears the specific restitution is not dependent on any further accounting, the court orders PSM to tender BAIC's shares to defendants within sixty days of the date of this order. The court further concludes that defendants are entitled to an accounting of the profits received by PSM as a result of its ownership of BAIC. The court therefore orders the parties, no later than **August 9, 2010,** to file a joint status report outlining a schedule for completion of the accounting.

### C. Whether National Is Entitled to Attorneys' Fees for Costs Incurred in the District Court

■ "Federal courts are required to apply state law in diversity actions with regard to the allowance or disallowance of attorney fees." *Bank of America v. Micheletti Family Partnership,* No. C 08–2902 JSW (JL), 2009 WL 1110830, *2 (N.D.Cal. Feb. 26, 2009) (quoting *Michael–Regan Co., Inc. v. Lindell,* 527 F.2d 653, 656 (9th Cir.1975), and citing *Crommie v. State of California Public Utilities Comm.,* 840 F.Supp. 719, 721 (N.D.Cal. 1994)).

When sitting in a diversity case, a federal court applies the law of the forum state regarding attorneys' fees awards. See, e.g., *Kona Enter., Inc. v. Estate of Bernice Pauahi Bishop,* 229 F.3d 877, 883 (9th Cir.2000). Under California law, "[California Civil Code § ] 1717 is the applicable statute when determining whether and how attorney's fees should be awarded un-

der a contract." *Sears v. Baccaglio*, 60 Cal.App.4th 1136, 1157, 70 Cal.Rptr.2d 769 (1998).

 Here, the Ninth Circuit held that the SPA was not a binding contract. California Civil Code § 1717, however, allows a prevailing party to recover attorneys' fees in "any action on a contract" that contains an attorneys' fee clause, even if the contract is not enforced. *Diamond v. John Martin Co.*, 753 F.2d 1465, 1467 (9th Cir. 1985) ("Where, as here, a party sued under an alleged contract containing an attorney's fee clause prevails by establishing that there was no such contract, that party is entitled to a section 1717 fee award," citing *Care Construction, Inc. v. Century Convalescent Centers, Inc.*, 54 Cal.App.3d 701, 703, 126 Cal.Rptr. 761 (1976)); *Santisas v. Goodin*, 17 Cal.4th 599, 611, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998) ("To ensure mutuality of remedy in this situation, it has been consistently held that when a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed").

Civil Code § 1717 states that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.... Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit." CAL. CIV. CODE § 1717(a).

PSM asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and four types of fraud.[32] After the verdict in its favor in district court, PSM filed a motion for attorneys' fees and costs under Civil Code § 1717.[33] The district court granted the motion, citing Section 14.14 of the SPA, which states: "In the event of any litigation between or among the Parties hereto respecting or arising out of this Agreement, the prevailing Party or Parties shall be entitled to recover reasonable attorneys' fees and costs, whether or not such litigation proceeds to final judgment or determination." [34]

As noted, Civil Code § 1717 is intended "to ensure mutuality of remedy." *Santisas*, 17 Cal.4th at 611, 71 Cal.Rptr.2d 830, 951 P.2d 399. Since PSM was awarded attorneys' fees after the district court verdict in its favor, and since the Ninth Circuit reversed the ruling, holding that there was no contract, PSM concedes that National Farm and Larry Chao are the prevailing parties and entitled to attorneys' fees under the agreement.[35] The court concurs.

Defendants seek $2,318,251.00 in attorneys' fees and $53,984.99 in costs in connection with the case tried before Judge Fairbank.[36] PSM challenges only $85,030.24 of the request. PSM's principal

---

**32.** Motion for Fees at 3.

**33.** Motion for Fees at 6.

**34.** *Id.*, Declaration of Nancy L. Fineman in Support of Defendant's Motion for Attorneys' Fees and Costs ("Fineman Decl."), Exh. B, at 75, Docket No. 495 (Sep. 9, 2009).

**35.** Fees Opposition at 2.

**36.** The court will address attorneys' fees and costs in connection with the bankruptcy proceeding separately, *infra*. Attorneys' fees and costs in connection with the appeal have already been awarded by the Ninth Circuit.

challenge to the fees and costs defendants incurred litigating this matter in district court concerns defendants' late addition of counsel in the weeks prior to trial. Dillingham & Murphy ("D & M"), the firm that had represented defendants in negotiating the SPA, had filed a motion to dismiss on their behalf, which was denied by Judge Gary Feess. The case was then transferred to Judge Fairbank and set for trial on May 15, 2007. As that date approached, Judge Fairbank *sua sponte* continued the trial to August 2007. On June 7, 2007, defendants retained Cotchett Pitre & McCarthy ("CP & M") as counsel. PSM asserts that CP & M's subsequent work was duplicative, since D & M must have been ready to try the case in May. CP & M, moreover, filed a trial brief on defendants' behalf, even though a trial brief had already been filed and Judge Fairbank had not authorized the filing of supplemental trial briefs.

CP & M billed $63,733.74 in June 2007. This amount includes numerous billing entries for telephone conferences, in which the subject of the conference has been redacted; "review of materials" "review of court docket"; preparation of an "overview memo"; review of previously filed and decided motions *in limine;* review of previously filed trial briefs; review of previously conducted depositions; "preliminary organization of [the case] files"; "review of records"; "[f]urther organization of file materials"; "index[ing]" of files and materials; and review of the complaint.[37]

■ Employing multiple attorneys or firms is per se not unreasonable. *Williamsburg Fair Housing Committee v. Ross–Rodney Housing Corp.,* 599 F.Supp. 509, 518 (S.D.N.Y.1984). "Indeed, division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings. Multi-

ple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law." *Id.* "If[, however,] two or more attorneys have duplicated each other's work, then the number of hours submitted should be reduced, since some of the work was unnecessary and the time claimed would therefore be unreasonable." *Id.*

The court discerns no bad faith in defendants' retention of new counsel in the weeks before trial. Indeed, it may well be that following the pretrial conference, where literally dozens of motions *in limine* were decided both in defendants' and plaintiff's favor, defendants assessed and decided that retaining new counsel to try the case would be advantageous. Judge Fairbank's *sua sponte* continuance of the trial date may have provided the impetus for engaging new counsel. Although defendants' decision was reasonable, PSM should not be required to pay for the time CP & M spent familiarizing itself with work already performed on the case. Defendants could have retained CP & M earlier, so that it could have participated in pretrial activities rather than reviewing them after the fact. The court will therefore reduce the attorneys' fees sought by $63,733.74 to account for expenses that were duplicative of prior counsel's work.

PSM also challenges $21,287.50 billed by two CP & M partners who did not travel to Los Angeles to participate in the trial, but who nonetheless recorded time to the file during trial. Joseph Cotchett billed $16,995.00 for work that included "[r]eview [of] depositions," "[o]utline of issues for trial," "[p]repare for clients' testimony," and "[r]eview of documents for use in opening." While it is probable that Mr. Cotchett was providing insight and input to the attorneys who were trying the case, the court notes that one of those attorneys

---

**37.** Fineman Decl., Exh. R, 192–202.

is an experienced trial lawyer who had been a member of the bar for almost 40 years in 2007. He was assisted by another attorney who had been in practice for four years in 2007. Defendants do not respond to PSM's arguments regarding Mr. Cotchett's time in their reply; absent some further explanation of the need for his involvement, the court concludes that PSM should not be required to pay for Mr. Cotchett's review of documents and trial preparation activities.

Nancy Fineman billed $4,292.50 for "[i]nternal conferences," the subject of which is unknown because the entries have been redacted, and for "trial preparation." Ms. Fineman's billing entries are vague and do not provide a clear sense of the work in which she was engaged. To the extent she participated in trial preparation, moreover, the work was duplicative, given that she was not trial counsel and that she has not identified specific support tasks she performed. The court, therefore, declines to award fees for the time expended by Ms. Fineman.

PSM's final challenge concerns $9,000 recorded by D & M corporate attorney, John Comizzi, to prepare to testify as a percipient witness regarding the negotiation of the SPA. Although Mr. Comizzi is an attorney at D & M, he did not serve as such while preparing his testimony as a percipient witness. See *Emmenegger v. Bull Moose Tube Co.*, 33 F.Supp.2d 1127, 1138 (E.D.Mo.1998) (declining to award attorneys' fees representing time a lawyer spent preparing to testify and testifying as a percipient witness). See also *Los Angeles Land Co. v. Brunswick Corp.*, No. CV 88–5285 MRP, 1991 WL 315122, *1 (C.D.Cal. Dec. 23, 1991) ("The Court does not find it appropriate to grant attorney's fees for the services of Ronald F. Greenspan who was the only officer in the plaintiff company who knew anything at all about the case. Without his testimony as

a percipient witness, there would have been no case on any theory. Thus, although Mr. Greenspan is a member of the bar, it is clear he did not act as counsel in this case"), rev'd on other grounds, 6 F.3d 1422 (9th Cir.1993). Defendants do not address PSM's objection in their reply, and the court concludes it is inappropriate to award fees for Mr. Comizzi's expenditure of time.

With the reductions noted, which total $94,030.24, the court awards defendants $2,224,220.76 in attorneys' fees.

PSM also opposes the award of certain costs. First among these is $5,511.67 expended to obtain hearing and trial transcripts. Section 1033.5, which governs the measure of attorneys' fees and costs in this proceeding, explicitly prohibits awarding costs for "[t]ranscripts of court proceedings not ordered by the court." Defendants respond that they seek this sum not as a district court trial cost, but as an item taxable under Rule 39(e)(2) of the Federal Rules of Appellate Procedure. This rule provides that the district court may award costs required to prepare "the reporter's transcript, if needed to determine the appeal." The court concurs with defendants that the amounts expended to obtain transcripts is an allowable cost under Rule 39(e)(2). It therefore awards the amount under that rule and not pursuant to § 1033.5.

PSM next challenges what it deems to be the double recovery of $25,464.21, which was expended to obtain deposition transcripts. Defendants have sought this amount both as a taxable cost in the bill of costs they filed with the clerk of court under Local Rule 54–4.6(a) and pursuant to § 1033.5(a)(3), which permits the court to award costs for "[t]aking, videotaping, and transcribing necessary depositions." It appears that defendants do not seek duplicate costs, but have merely invoked

alternate methods of recovering the amount expended to obtain the transcripts. Because this cost can be awarded under § 1033.5, the court includes it as a recoverable cost in this order. The court directs, however, that defendants file a pleading advising the clerk that the court has awarded the cost incurred to obtain deposition transcripts and that the same sum should not be awarded by the clerk.

Having addressed PSM's arguments, the court awards $53,984.99 in costs for proceedings before the district court.

### D. Whether Defendants Are Entitled to Fees Incurred in Connection with the Bankruptcy Proceedings

In addition to seeking an award of the fees and costs incurred in connection with the district court litigation, defendants also seek $1,512,837.72 in fees and costs incurred in connection with the bankruptcy proceedings.[38] This amount includes fees awarded to National Farm's lawyers by the bankruptcy court and other fees and costs incurred by defendants because of the bankruptcy.[39]

Overturning a Ninth Circuit rule that attorneys' fees could not be granted under state law in a bankruptcy proceeding, the Supreme Court held in 2007 that "[attorneys' fees] claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 452, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

California courts have ruled that trial judges have authority to award attorneys' fees for expenses incurred in bankruptcy court litigation. *Chinese Yellow Pages Co. v. Chinese Overseas Marketing Service Corp.*, 170 Cal.App.4th 868, 882, 88 Cal. Rptr.3d 250 ("[T]he debtor asserts the trial

court had no authority to impose any fees or costs because they were incurred in the chapter 11 proceeding. These contentions have no merit as federal bankruptcy law does not affect the power of a trial court to impose reasonable and necessary attorney fees and costs pursuant to a state statute . . .").

Defendants seek fees and costs associated with the bankruptcy proceedings on three bases: under the attorneys' fees clause of the SPA; as costs incurred in lieu of a bond; and in the exercise of the court's discretion given the unique circumstances in this case.

As noted, Civil Code § 1717 allows a prevailing party to recover attorneys' fees in "any action on a contract" that contains an attorneys' fee clause, even if the contract is not upheld. *Diamond*, 753 F.2d at 1467. Defendants contend this rule should be interpreted broadly to include sums paid in connection with bankruptcy court proceedings. The language of the SPA, moreover, is broad, allowing the prevailing party to recover fees and costs "[i]n the event of any litigation between or among the Parties hereto respecting or arising out of this Agreement."

The principal case on point is *Circle Star Center Associates, L.P. v. Liberate Technologies*, 147 Cal.App.4th 1203, 55 Cal. Rptr.3d 232 (2007). Circle Star owned two office buildings in which Liberate leased more than 180,000 square feet of space. Four years after commencement start of the lease term, Liberate defaulted and breached the lease. It unilaterally stopped paying rent, moved out, and filed a Chapter 11 bankruptcy petition. At the time, Liberate's assets far exceeded its liabilities, and Circle Star successfully moved to dismiss the bankruptcy case on the grounds that it was filed in bad faith.

---

**38.** Motion, at 3.

**39.** *Id.*

The bankruptcy court concluded that Liberate was "very solvent, very liquid, and [could] sell its assets as a going concern outside of bankruptcy." It further concluded that "[b]ecause the petition never should have been filed, it is appropriate to restore Debtor and Circle Star to the status quo ante as much as possible. Thus, the accompanying order provides that the dismissal shall unwind Debtor's rejection of the Circle Star lease." *Id.* at 1207, 55 Cal.Rptr.3d 232.

Thereafter, Circle Star initiated an action in state court seeking more than $1.2 million in attorneys' fees incurred in the bankruptcy proceeding. The California appellate court noted that "[w]hen a case remains within the jurisdiction of the bankruptcy court, the rule is well settled: a party may not recover attorney fees incurred in litigating purely bankruptcy law issues unless fees are authorized under a specific provision of the Bankruptcy Code.... This is even true where the bankruptcy litigation concerns a contract that contains a provision entitling the prevailing party to fees." *Id.* at 1208–09, 55 Cal.Rptr.3d 232 (citing *In re Hassen Imports Partnership*, 256 B.R. 916 (9th Cir. BAP 2000)). "In contrast," it observed, "a prevailing party in a bankruptcy proceeding may be entitled to an award of attorney fees incurred litigating state law issues." *Id.* at 1209 n. 5, 55 Cal.Rptr.3d 232.

The California appellate court held that the rule precluding the recovery under state contract law of fees incurred litigating bankruptcy issues in the bankruptcy court did not "preclude a party from pursuing in a postbankruptcy, state court contract action the fees incurred obtaining the dismissal of a bankruptcy proceeding." *Id.* at 1209, 55 Cal.Rptr.3d 232.[40] The court concluded that awarding contractual attorneys' fees for amounts incurred in securing dismissal of the bankruptcy proceeding would "not interfere with the uniformity required by federal bankruptcy law" or "with the bankruptcy court's control of its proceedings." *Id.* at 1210, 55 Cal.Rptr.3d 232.

Having concluded that an award of attorneys' fees was permitted, the court reviewed the text of the attorneys' fees clause in the lease. It stated: "If Tenant or Landlord brings *any action* for any relief against the other, declaratory or otherwise, arising out of this Lease ... the losing party shall pay to the prevailing party a reasonable sum for attorney's fees...." *Id.* at 1211, 55 Cal.Rptr.3d 232 (italics and omissions original). Liberate argued that filing a bankruptcy petition initiated a special proceeding rather than an action. Circle Star countered that extrinsic evidence revealed that the parties intended the provision to encompass such proceedings. The appellate court held

---

**40.** The court distinguished Ninth Circuit cases declining to award such fees because they concerned

> "claims for fees raised *in* bankruptcy proceedings; none involved the rights of the parties to seek fees in state court *after* a bankruptcy was dismissed. The difference in posture is key. First, Circle Star's suit is not against a bankruptcy estate and a fee award would not diminish a bankruptcy estate to the detriment of other creditors. Second, Liberate's bankruptcy was dismissed. A dismissal, unless otherwise ordered, 'revests the property of the estate in

the entity in which such property was vested immediately before the commencement of the case under this title.' [] 11 U.S.C. § 349(b)(3).[ ] This provision 'obviously contemplates that on dismissal a bankrupt is reinvested with the estate, subject to all encumbrances which existed prior to the bankruptcy. After an order of dismissal, the debtor's debts and property are subject to the general laws, unaffected by bankruptcy concepts.' [] *In re Income Property Builders, Inc.* [,] 699 F.2d 963, 965 [ (9th Cir.1982) ]." *Circle Star*, 147 Cal.App.4th at 1209, 55 Cal.Rptr.3d 232.

that the trial court had erred in failing to consider the extrinsic evidence. *Id.* ("The court was required to consider Circle Star's extrinsic evidence before deciding whether the contract language was reasonably susceptible to its suggested interpretation").

In *Chinese Yellow Pages Co. v. Chinese Overseas Marketing Service Corp.*, 170 Cal.App.4th 868, 88 Cal.Rptr.3d 250 (2008), defendant entered into a settlement agreement with plaintiff. Plaintiff thereafter filed an action alleging unfair competition and false advertising against defendant, asserting that it had misrepresented the terms of the settlement agreement to potential customers. *Id.* at 871, 88 Cal. Rptr.3d 250. The second action went to trial and the jury awarded substantial damages to plaintiff. *Id.* Before the judgment could be enforced, the defendant filed a Chapter 11 bankruptcy petition. *Id.* at 871–72, 88 Cal.Rptr.3d 250. Plaintiff sought to enforce the judgment in the bankruptcy proceedings and incurred more than $500,000 in attorneys' fees in the process. *Id.* at 872–77, 88 Cal.Rptr.3d 250. Applying *Circle Star* and *Travelers,* the California appellate court held that the trial court erred in concluding that it lacked authority to award fees incurred in the bankruptcy proceeding as a matter of law. *Id.* at 879, 88 Cal.Rptr.3d 250. It concluded that bankruptcy law did not prevent the trial court from ruling on an attorneys' fees application seeking fees incurred in attempting to enforce a judgment in a bankruptcy proceeding. *Id.* at 882, 88 Cal.Rptr.3d 250 ("[F]ederal bankruptcy law does not affect the power of a trial court to impose reasonable and necessary attorney fees and costs pursuant to a state statute such as section 685.040 after the automatic stay has expired as occurred here").

A similar result obtained in *Jaffe v. Pacelli,* 165 Cal.App.4th 927, 937–38, 82 Cal. Rptr.3d 423 (2008).[41] Relying on *Circle Star,* the court held that the prevailing party in a motion to enforce a judgment in bankruptcy court was "entitled to request in state court an award of attorney fees and costs for those efforts exerted in the bankruptcy proceedings, even if the bankruptcy court had the discretion to make such an award as a penalty or sanction." *Id.*

PSM opposes an award of fees and costs incurred in connection with the bankruptcy proceedings on two bases. First, it argues that the attorneys' fees provision in the SPA, which applies to "any litigation between or among the Parties hereto respecting or arising out of th[e] Agreement," does not encompass the bankruptcy proceeding since it was not litigation between the parties. The attorneys' fees provision is quite similar to that at issue in *Circle Star.* That provision stated that if either party brought "any action for any relief against the other, declaratory or otherwise, arising out of this Lease … the losing party shall pay to the prevailing party a reasonable sum for attorney's

---

**41.** Both *Chinese Yellow Pages* and *Jaffe* addressed post-judgment motions for attorneys' fees under California Code of Civil Procedure § 685.040. As is evident from the fact that these courts relied on *Circle Star,* which concerned an award of fees under Civil Code § 1717, however, the general principles articulated apply regardless of the state statute that gives rise to a right to fees. This is particularly true since § 685.040 permits a post-judgment award of fees only "if the underlying judgment includes an award of attorney's fees to the judgment creditor pursuant to subparagraph (A) of paragraph (10) of subdivision (a) of Section 1033.5." See CAL.CODE CIV. PROC. § 685.040. See also CAL.CODE CIV. PROC. § 1033.5(a)(10)(A) ("The following items are allowable as costs under Section 1032: … Attorney's fees, when authorized by … [c]ontract").

fees." *Circle Star,* 147 Cal.App.4th at 1211, 55 Cal.Rptr.3d 232.

■ The *Circle Star* court held that the provision was sufficiently ambiguous that the trial court should have considered extrinsic evidence to determine its meaning. Here, neither party has proffered extrinsic evidence nor requested that it be allowed to submit extrinsic evidence regarding the meaning of the attorneys' fees provision in the SPA. "[W]here no extrinsic evidence is introduced or the evidence is not in conflict," the interpretation of the contract is a question of law and the "court will independently construe the contract." *Wolf v. Superior Court,* 114 Cal.App.4th 1343, 1359, 8 Cal.Rptr.3d 649 (2004). "Litigation" has a broader reach than "action." In *Circle Star,* the court cited the statutory definition of "action" found in California Code of Civil Procedure § 22—"an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." *Circle Star,* 147 Cal.App.4th at 1211 n. 8, 55 Cal.Rptr.3d 232 (quoting CAL. CODE CIV. PROC. § 22). It observed Code of Civil Procedure § 23 defined "[e]very other remedy" as a "special proceeding." *Id.* (quoting CAL.CODE CIV. PROC. § 22).

The Code of Civil Procedure defines "litigation" as "any civil action or proceeding, commenced, maintained or pending in any state or federal court." CAL.CODE CIV. PROC. § 391(a). Consequently, while the contract in *Circle Star* was ambiguous, the contract here is clear; because the bankruptcy proceeding was "litigation" in which the interests of the parties were adverse, either may invoke the attorneys' fees clause to recover sums incurred in connection with the bankruptcy proceeding.

PSM's second argument carries more weight. The attorneys' fees provision in the SPA states that "[i]n the event of any

litigation between or among the Parties hereto respecting or arising out of th[e] Agreement, the *prevailing Party or Parties* shall be entitled to recover reasonable attorneys' fees and costs." Civil Code § 1717(b)(1) defines the prevailing party as "the party who recovered a greater relief in the action on the contract" and provides that the "court may also determine that there is no party prevailing on the contract for purposes of this section." PSM questions whether defendants may fairly be considered the prevailing parties in the bankruptcy proceeding, a forum in which PSM prevailed on its motion to enforce the judgment and defendants' reorganization plans were not approved.

The court notes that § 1717 governs the award of attorneys' fees in this case. That section provides in part that "[i]n any *action* on a contract . . ., then the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs." CAL. CIV. CODE § 1717 (emphasis supplied). In *Wood v. Santa Monica Escrow Co.,* 176 Cal.App.4th 802, 97 Cal. Rptr.3d 909 (2009), defendant prevailed and obtained a dismissal with prejudice. Defendant sought attorneys' fees, but both the trial and appellate courts concluded that the statutory attorneys' fees provision at issue in that case applied to only prevailing plaintiffs. On remand, the plaintiff sought attorneys' fees as the prevailing party on defendant's fees motion and appeal. The California appellate court held that the trial and appeal were "parts of a single proceeding," as to which there could be only one prevailing party. It held that the defendant, which had obtained dismissal with prejudice of the action, was the prevailing party on the contract, and plaintiff could not seek attorneys' fees under § 1717. *Id.* at 806–08, 97 Cal.Rptr.3d 909.

No court has considered whether the principle articulated in *Wood*—that a trial and appeal are a unified whole in assessing prevailing party status for purposes of awarding attorneys' fees—applies to trial court proceedings that spawn a collateral bankruptcy proceeding. Certainly, *Circle Star* and its progeny stand for the proposition that § 1717 can reach collateral proceedings. *Wood* stands for the proposition that only one party can fairly be described as the party that prevailed on the contract. Notably, § 1717 states that "[i]n any action on a contract," it is the party determined to be the "party prevailing on the contract" that is entitled to fees; not the party who prevailed in a particular lawsuit. *Chinese Yellow Pages* and *Jaffe* stand for the proposition that enforcement proceedings in bankruptcy court can be actions on the contract. Defendants are the parties that prevailed on the contract, and are thus entitled to attorneys' fees incurred in connection with any action on the contract.

This conclusion, however, does not entitle defendants to recover all fees and costs incurred in the bankruptcy proceeding, as not all of those fees and costs were generated in connection with an action on the contract. In *Chinese Yellow Pages* and *Jaffe*, creditors moved to enforce the judgment they had obtained in an action on the contract in the bankruptcy court. In *Circle Star*, the movant sought to dismiss the bankruptcy proceedings and lift the stay in order to secure its contractual rights. In seeking reorganization, Liberate had proposed a Chapter 11 plan that would have effected a surrender of the leased premises and a reduction in its rent obligation to Circle Star from $45 million to $8 million. *Id.* at 1207, 55 Cal.Rptr.3d 232. In granting Circle Star's motion to dismiss the bankruptcy proceedings, the bankruptcy court restored the status quo ante and held that the dismissal had the effect of unwinding Liberate's rejection of the Circle Star lease. *Circle Star*, 147 Cal.

App.4th at 1207, 55 Cal.Rptr.3d 232. Because the party that sought fees in *Circle Star, Chinese Yellow Pages*, and *Jaffe* was a party that participated in the bankruptcy proceeding for the express purpose of enforcing or protecting contractual rights, as opposed to a party that initiated a bankruptcy proceeding to avoid enforcement of an adverse judgment, there was no reason to consider whether the whole of the bankruptcy proceeding constituted an "action on a contract" within the meaning of § 1717. In each case, the party seeking attorneys' fees had intervened for the limited purpose of enforcing the terms of the contract.

National Farm filed a voluntary Chapter 11 bankruptcy petition on December 5, 2007. Larry Chao filed a Chapter 11 petition on January 6, 2008. On December 13, 2007, PSM filed a notice of appearance in National Farm's bankruptcy proceeding. On December 28, 2007, the United States Trustee Office filed a motion to appoint a trustee for BAIC, citing (1) the Chaos' conflicting roles as claimants in National Farm's bankruptcy and members of its board of directors; and (2) acrimony between National Farm and its creditors. In response, defendants added three outside directors to the board and appointed them to a special litigation committee that was authorized to make all decisions regarding the claims of Larry and Julie Chao. *In re National Farm Financial Corp.* ("*National Farm II*"), No. 07–31580 TEC, 2008 WL 410236, *2 (Bankr.N.D.Cal. Feb. 12, 2008).

On January 18, 2008, PSM joined the United States Trustee's motion. The bankruptcy court granted the motion on February 12, 2008. It found that the special litigation committee did not resolve the Chaos' conflict of interest, and noted that National Farm would "have great difficulty confirming a plan under which the Chaos

retain[ed] control of BAIC," since "PSM's Judgment represent[ed] more than 99 percent of the scheduled general unsecured claims." *Id.* at *3. The court commented that National Farm "ha[d] exacerbated he debtor-creditor conflict by asserting several highly questionable legal positions." It noted, for example, that National Farm's contention that PSM's claim should be subordinated to Julie Chao's claim against National Farm for the harm done to her equity interest by Larry Chao had "little legal support." *Id.* The court made a similar finding with respect to National Farm's argument that PSM's claim should be subordinated to the level of its common stock under 11 U.S.C. § 501(b) and its assertion that PSM's claim should be subordinated to Julie Chao's claim under § 510(c) because PSM conduct in the district court litigation was unfair. *Id.* Indeed, it found that the latter claim "lack[ed] any colorable basis." *Id.* at *5. The court specifically found that National Farm "ha[d] taken unfounded positions with the objective of preserving the Chaos' control over BAIC." *Id.* at *6. Because National Farm was not considering the interests of its creditor, PSM, as well as the interests of its stockholders, the court concluded that it had breached its duty to deal impartially with those interested in the estate. It found that National Farm "ha[d] not impartially weighed the competing claims of the Chaos and PSM, but ha[d] instead asserted the most aggressive positions possible in favor of the Chaos and against PSM," *id.* at *5. and concluded that, given "the nature and source of the conflict that ha[d] arisen between [National Farm] and its major creditor," [PSM,] there was "clear and convincing evidence that cause exists for the appointment of a chapter 11 trustee.... " *Id.*

On the same day that National Farm filed its bankruptcy petition, it initiated an adversary proceeding that sought a preliminary injunction against PSM. National Farm sought to have the court enjoin PSM from enforcing the judgment against BAIC, arguing that enforcement would unduly interfere with its ability to reorganize. *In re National Farm Financial Corp.* ("*National Farm I*"), No. 07–3134 TC, 2008 WL 183595, *1 (Bankr.N.D.Cal. Jan. 18, 2008). On December 6, 2007, PSM and National Farm stipulated to a temporary restraining order that enjoined PSM from enforcing the judgment until resolution of the motion for preliminary injunction. The bankruptcy court ultimately found that National Farm had not shown a likelihood that it would be able to confirm a reorganization plan. It noted that National Farm could confirm a plan that allowed its shareholders to retain the shares of BAIC only if its general unsecured creditors accepted the plan. Since PSM held "virtually all" of the general unsecured claims against National Farm, the court observed, it had the ability to "block confirmation of any plan" that would prevent it from securing ownership of BAIC. *Id.* at *3. National Farm filed an ex parte application for reconsideration of this ruling on January 30, 2008, which was denied on February 12, 2008. On February 13, 2008, however, the bankruptcy court extended the terms of the temporary restraining order through the end of February 2008.

On March 4, 2008, PSM, National Farm's trustee, and BAIC stipulated to continue the temporary restraining order in force through March 14, 2008. Additional stipulations extended the temporary restraining order to May 12, 2008. The trustee and PSM then stipulated to an indefinite temporary restraining order that PSM could terminate the order on five days' notice, and the adversary proceeding concluded.

On April 1, 2008, the court authorized the trustee to employ Jones Day as counsel, to employ Bacheki, Crom & Co., LLP,

as accountants and financial advisors, and to replace BAIC's board of directors. On April 22, 2008, the court authorized the trustee to employ Valuation Research Corporation as valuation consultants. On May 30, 2008, it authorized the trustee to employ a mediator in the hope of settling the parties' dispute.

On May 28, 2008, PSM filed a motion for relief from the automatic stay so that it might execute the judgment. The bankruptcy court denied this motion without prejudice on June 27, 2008. On July 14, 2008, the trustee reported that the parties' mediation had not been successful; she recommended that all of BAIC's assets be transferred to PSM because she believed there was little likelihood that a reorganization plan could be confirmed over PSM's objection. On July 28, 2008, the bankruptcy court ordered that BAIC's shares be transferred; the transfer was effected on October 21, 2008.[42]

■ "The trial court has broad discretion to determine the amount of a reasonable fee [under § 1717], and the award of such fees is governed by equitable principles." *Gorman v. Tassajara Development Corp.*, 178 Cal.App.4th 44, 92, 100 Cal.Rptr.3d 152 (2009) (quoting *PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1094–1095, 95 Cal.Rptr.2d 198, 997 P.2d 511 (2000)). Among the relevant factors a court may consider is "[t]he 'necessity for and the nature of the litigation'...." *Id.* (quoting *Kanner v. Globe Bottling Co.*, 273 Cal.App.2d 559, 569, 78 Cal.Rptr. 25 (1969)). In *EnPalm, LCC v. Teitler Family Trust*, 162 Cal.App.4th 770, 75 Cal. Rptr.3d 902 (2008), the trial court had decided a motion seeking $116,000 in contractual attorneys' fees. It first concluded that a reasonable fee for the work that had been performed was $50,000. The trial court stated "that its calculation did 'not

end there,' [and] went on to apply equitable principles to reduce [the] fees by 90 percent to $5,000 because [the party seeking fees] intentionally lied under oath about various material matters." *Id.* at 773, 75 Cal.Rptr.3d 902. It found that: "(1) [the party seeking fees had] engaged in conduct that made much of the litigation unnecessary and; (2) as a result, most of the lodestar figure represented attorney fees that were unreasonable." *Id.* at 775, 75 Cal.Rptr.3d 902. Although the appellate court held that trial courts may not reduce fee awards "for purely subjective reasons, such as [their] views on the merits of a case, or antipathy toward a party, her counsel, or counsel's litigation strategy," *id.* at 775 n. 5, 75 Cal.Rptr.3d 902, it held that trial courts can use equitable principles to reduce the amount of fees awarded based on a finding that the fees were unnecessary. *Id.* at 778, 75 Cal. Rptr.3d 902.

■ *EnPalm* controls the outcome here. Having reviewed the extensive record created in the bankruptcy court, the comments of the bankruptcy court concerning non-meritorious, bordering on frivolous, nature of the arguments defendants advanced in that forum, and defendants' apparent admission that the bankruptcy proceeding was, at its core, an effort to evade the judgment entered by Judge Fairbank and circumvent her decision to deny a stay in ways not contemplated by the Federal Rules or relevant statutes, the court is compelled to find that the fees incurred in the bankruptcy proceeding were unnecessary under the rule articulated in *EnPalm*. Perhaps the best illustration of this point is defendants' argument that the bankruptcy proceedings constituted a deposit in lieu of a bond.

---

**42.** Neither party has provided any detail regarding Larry Chao's personal bankruptcy.

The court thus focuses on National Farm's bankruptcy proceeding.

Defendants assert that the court should treat the fees incurred in the bankruptcy proceeding as a "deposit in lieu of a bond" recoverable under *Cooper v. Westbrook Torrey Hills, LP*, 81 Cal.App.4th 1294, 97 Cal.Rptr.2d 742 (2000). In *Cooper*, a homeowner who was unable to post a bond to stay foreclosure proceedings instead obtained a loan to make a cash deposit. When he ultimately prevailed, the court found that as the prevailing party, he was entitled to recover the costs he incurred obtaining the loan. *Id.* at 1299, 97 Cal.Rptr.2d 742. Defendants extrapolate from this limited holding a rule that costs incurred in connection with any activity that delays execution of a judgment, including all costs associated with a bankruptcy proceeding that provides a basis for an automatic stay, are recoverable. This analysis stretches *Cooper* too far. The loan proceeds in *Cooper* were effectively equivalent to a bond, and were deposited with the clerk of court in the same manner that a bond would have been. Defendants here never filed a bond or deposited cash in any amount with the clerk of court. The fact that they achieved, to some extent, the same benefit they would have received had they filed a bond—i.e., a delay in execution of the judgment—does not make the situations analogous. The "automatic stay is intended to benefit creditors collectively by preventing individual creditors from acting unilaterally to the detriment of other creditors." *In re Mid–City Parking, Inc.*, 332 B.R. 798, 815 (Bankr. N.D.Ill.2005). It is not intended to benefit the debtor by delaying execution of a judgment pending appeal. Indeed, without assessing whether defendants engaged in bad faith tactics by filing bankruptcy petitions, the rule defendants advocate would almost certainly encourage bad faith and dilatory bankruptcy filings.

Defendants' "deposit in lieu of bond" argument is telling for another reason. It is a tacit acknowledgment that the proceedings before the bankruptcy court were not a true effort to reorganize but an effort to avoid execution on the final judgment. See *National Farm II*, 2008 WL 410236 at *2 ("Debtor has stated quite clearly that its objective is to enable the Chao Family Trust to retain control of BAIC, the Debtor's wholly-owned subsidiary"). In arguing that the balance of hardships tipped in its favor and that it was entitled to a preliminary injunction restraining PSM's enforcement of the judgment, National Farm asserted that its "interest [was] in having some effective remedy if the Judgment [were] reversed. [It sought] to do so by staying all enforcement of the Judgment during what may be a protracted appeal." *National Farm I*, 2008 WL 183595 at *3. National Farm had "no assets other than the BAIC shares with which to pay the $40 million Judgment." *National Farm II*, 2008 WL 410236 at *3. As a result, PSM's judgment represented "more than 99 percent of the scheduled general unsecured claims." *Id.* at *3. As the bankruptcy court noted, a reorganization plan can be approved only "if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors." 11 U.S.C. § 1126(c); *National Farm I*, 2008 WL 183595 at *2 ("A plan cannot be confirmed over the objection of PSM, because it holds more than one-third of the general unsecured claims"). Because "[i]t [was] clear ... that PSM h[eld] more than one-third in amount (indeed virtually all) of the general unsecured claims against Debtor, and that PSM [could] therefore block confirmation of any plan," *id.* at *3, the bankruptcy was doomed from the outset. In deciding to appoint a trustee, the bankruptcy court emphasized that National Farm and the Chaos had only one objective—to retain

control of BAIC. This made it impossible for them to "weigh impartially all reasonable possibilities for resolving the case" and caused them to take "unfounded positions with the objective of preserving the Chaos' control over BAIC." *National Farm II*, 2008 WL 410236 at *6.

Although the bankruptcy court never found that defendants' bankruptcy petitions were frivolous or filed in bad faith, the record created in that forum causes this court to conclude that the entirety of the bankruptcy proceedings were unnecessary within the meaning of *EnPalm*. Consequently, it concludes that defendants are not entitled to an award of fees or costs incurred in connection with those proceedings. Because PSM's judgment represented more than 99% of defendants' general unsecured creditors, no reorganization plan could be approved without PSM's consent. As a consequence, the bankruptcy proceedings only delayed PSM's inevitable execution of the judgment. This is, at bottom, why defendants argue that those proceedings were "in lieu of an appeal bond." The proceedings were unnecessary because they could not rearrange or reallocate the rights of PSM and defendants vis-á-vis the contract or BAIC. As a consequence, equitable principles do not support awarding bankruptcy fees and costs.

Because the court concludes that an award of fees and costs for the bankruptcy proceedings would be inequitable because those proceedings were unnecessary, defendants' motion for attorneys' fees and

costs is denied insofar as it is based on proceedings before the bankruptcy court.[43]

## III. CONCLUSION

Defendants' motion for restitution is granted in part and denied in part. Restitution in the form of the return of BAIC's shares to defendants and an accounting of the profits PSM generated through its ownership of those shares is ordered. The court directs the parties, no later than **August 9, 2010,** to file a joint status report outlining a schedule for completion of the accounting. The court directs PSM to transfer ownership of the BAIC shares to defendants within sixty days of the date of this order.

Defendants' motion for attorneys' fees is granted in part and denied in part. As respects proceedings before the district court, the court awards defendants $2,224,220.76 in attorneys' fees and $53,984.99 in costs. As respects fees and costs incurred in connection with proceedings in the bankruptcy court, the court denies defendants' motion.

---

**43.** Defendants also note that California Code of Civil Procedure § 1033.5(c)(4) provides that "[i]tems not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion." Section 1033.5 enumerates costs that can and cannot be recovered. It does not purport to define the scope of proceedings for which the court may award fees. Subsection (c)(4) "provides that the court in its discretion may allow or deny cost[ ] items not expressly mentioned in the section," *Cobler v. Stanley, Barber, Southard, Brown & Associates,* 217 Cal. App.3d 518, 533, 265 Cal.Rptr. 868 (1990). It does not authorize the court to expand a party's the substantive right to attorneys' fees.